# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br>     v.<br><br>ZM QUANT INVESTMENT LTD.,<br>BAIJUN OU, a/k/a ERIC OU, and<br>RUIQI LAU, a/k/a RICKY LIU,<br><br>                              Defendants. | Civil Action No. 24-CV-____(___)<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission" or "SEC"), alleges the following against the defendants, ZM Quant Investment Ltd. ("ZM Quant"); Baijun Ou, a/k/a Eric Ou; and Ruiqi Lau, a/k/a Ricky Liu:

## SUMMARY

1.     ZM Quant claims on its website that it provides its clients, typically the offerors of crypto assets, with services designed to "help . . . illiquid new token projects make the markets more efficient by reducing price volatility and supporting fair prices."  ZM Quant refers to these services as "market-making," which it explains is "especially important in [sic] crypto space."  ZM Quant further claims that it "provides professional digital asset market making service for token projects and exchanges, using sophisticated algorithms . . . [to] help our clients establish a reliable and efficient market."

2.     What ZM Quant actually provides is on-demand market manipulation.  For a monthly fee, ZM Quant engages in manipulative trading of its clients' crypto assets to artificially

inflate their price and trading volume.  ZM Quant does this for the express purpose of misleading investors to believe that there is a robust market for these crypto assets when there is often little or no genuine interest in them.  That fake trading volume is reported on websites that the investing public consults when deciding which crypto assets to buy and sell, and which trading platforms to buy and sell them on.

3.      ZM Quant advertises that it has been in the "crypto space" since 2018, and that since that time it has worked as a designated market maker "for 120+ Exchanges and 1100+ issued coins/tokens."  ZM Quant boasts on its website:  "Our HFT [high frequency trading] MM [market-making] strategies and trading bots power $1~3 bn [billion] in daily trading volume for more than 2500 [crypto asset] trading pairs."

4.      In reality, ZM Quant manipulates the markets for its clients' crypto assets either by engaging in extensive wash trading or through other types of purchases and sales that likewise serve no economic purpose.  While the manner of manipulative trading varies depending on the type of trading platform used for the manipulation, these transactions are expressly designed to create the false impression of market interest in the tokens that they trade.

5.      As ZM Quant employee Ruiqi "Ricky" Lau explained to a prospective client, when ZM Quant is successful in creating artificial volume for a crypto asset and this growth is noted on a popular crypto asset trading platform, "the users will come to trade.  They will see the potential opportunities and they will . . . chase the price."

6.      In other discussions with a prospective client, ZM Quant personnel specifically touted their ability to "create trading volumes" and "pump the price" of a crypto asset.  ZM Quant traders explained that they achieve these results through "self trade[s]" designed to trigger actual market interest from the investing public.

7.      In or around January 2024, ZM Quant was retained for a monthly fee to provide services to purported promoters of NexFundAI, a crypto asset being offered and sold as a security.  NexFundAI purported to be a vehicle for investment in early-stage artificial intelligence projects.  Lau and another ZM Quant employee, defendant Baijun "Eric" Ou, met with the NexFundAI project team, who explained that they wanted to hire ZM Quant to generate artificial trading volume for the purpose of increasing interest in the crypto asset, eventually allowing the project team to "pull [their] profits."  Lau confirmed to the NexFundAI project team that ZM Quant could "create trading volumes" to create the impression of a robust market for NexFundAI and induce others to buy it.  Lau also indicated that ZM Quant could "make sure" the project team could "cash out as much as you want to get a profit."

8.      ZM Quant was unaware that NexFundAI and its promotional materials had been developed at the direction of the Federal Bureau of Investigation ("FBI") as a part of its undercover investigation of crypto asset market manipulation.

9.      On or about May 31, 2024, ZM Quant traded NexFundAI on the Uniswap crypto asset trading platform for approximately nine hours, generating approximately $4,600 in artificial trading volume.  During that period, ZM Quant's manipulative trades accounted for approximately 83.6% of NexFundAI's trading volume.

10.     This manipulative trading of NexFundAI was business as usual for ZM Quant. From approximately September 2021 to September 2023, ZM Quant provided market manipulation services, in exchange for a monthly fee, to project teams selling a crypto asset named Saitama Inu ("Saitama") and a crypto asset named SaitaRealty ("SaitaRealty," and, together with Saitama, the "Saitama Crypto Assets"), both of which were offered and sold as securities.  In one stark example of market manipulation services, in or around May 26, 2023,

after the SaitaRealty project team received a warning from a crypto asset trading platform that the token was at risk of being removed from the platform due to low trading volume, ZM Quant rapidly traded SaitaRealty in a manner designed to increase the volume of trading on the platform.  Within 24 hours, the trading volume increased from de minimis levels to quadrillions of individual trades and billions of dollars in daily volume.  As a result of ZM Quant's manipulative trading, SaitaRealty saw a 412,000,000,000 percent increase in transaction quantity.

11.     Defendants' conduct has caused significant harm—to the integrity of the markets and to the investor victims who traded in crypto assets fraudulently lured by the fake volumes and prices that ZM Quant manufactured.  This conduct is ongoing and will continue unless Defendants are permanently enjoined.

## VIOLATIONS

12.     As a result of the conduct alleged herein, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)], Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(2) and 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## RELIEF SOUGHT

13.     The Commission seeks permanent injunctions against Defendants; disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest pursuant to Sections 21(d)(5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and (7)]; civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and an order

prohibiting Defendants from participating, directly or indirectly, in any issuance, purchase, offer, or sale of any securities, provided, however, that such injunction shall not prevent Defendants Ou and Lau from purchasing or selling securities for their personal accounts; and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

15.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Massachusetts, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. Communications in furtherance of the scheme were made to and from the District.

## DEFENDANTS

16.     **ZM Quant Investment Ltd.** ("ZM Quant") is a company registered in the British Virgin Islands that operated both inside and outside the United States.  ZM Quant offers various services for crypto asset projects, including investment and consulting services, and purported "market-making."  ZM Quant purports to have offices in Hong Kong, Singapore, London, and Seoul.

17.     **Baijun Ou, a/k/a Eric Ou,** has at all relevant times held himself out to be ZM Quant's Global Development Business Lead.  Ou is believed to reside in Hong Kong.

18. **Ruiqi Lau, a/k/a Ricky Liu,** has held himself out to be ZM Quant's Head of Partnership & Business Development/Crypto/Listings/NFTs and its Regional Lead of Business Development.  Lau is believed to reside in London, England, United Kingdom.

## RELATED INDIVIDUALS

19.  Russell Armand, a/k/a "Saitamaguru1," 42, resides in Texas.  The Commission has charged Armand with federal securities law violations related to the Saitama Crypto Assets. *See SEC v. Russell Armand et al*. (D. Mass. 2024).

20.  Maxwell Hernandez, a/k/a "MaxEquation," 36, resides in Massachusetts.  The Commission has charged Hernandez with federal securities law violations related to Saitama in the same complaint charging Armand.  *See id*.

21.  Manpreet Singh Kohli, a/k/a "Mkay Saitama," a/k/a "mannythehitman," 39, resides in India and London, England.  The Commission has charged Kohli with federal securities law violations related to the Saitama Crypto Assets in the same complaint charging Armand.  *See id*.

22.  Nam Tran, a/k/a "Ntran1234," 49, is believed to reside in Washington.  The Commission has charged Tran with federal securities law violations related to the Saitama Crypto Assets in the same complaint charging Armand.  *See id*.

23.  An individual who identifies himself in private chats on the encrypted messaging platform Telegram as "Ariza | ZMQuant" works for ZM Quant.

24.  An individual who identifies himself on Telegram as "Marco | ZMQuant" works for ZM Quant.

## REGULATORY BACKGROUND

25.  As the Supreme Court has recently reemphasized, the Securities Act and the

Exchange Act "form the backbone of American securities law."  *Slack Tech., LLC v. Pirani*, 598

U.S. 759, 762 (2023).  Together, these Acts provide for the regulation of various activities in the

markets for securities and define "security" broadly to include a wide range of assets, including

"investment contracts."  Securities Act § 2(a)(1) [15 U.S.C. § 77b(a)(1)]; Exchange Act

§ 3(a)(10) [15 U.S.C. § 78c(a)(10)].

26.     Congress enacted the Exchange Act in part to provide for the regulation of the

national securities markets.  Congress created the SEC and charged it with protecting investors,

preserving fair and orderly markets, and facilitating capital formation.  In keeping with

Congress' goals, these Acts contain broad anti-fraud and anti-manipulation prohibitions.

27.     Over seventy years ago, the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S.

293 (1946), set forth the relevant test for determining whether an instrument is an investment

contract subject to regulation under U.S. securities laws.

28.     Investment contracts are transactions, contracts, or schemes through which a

person invests money in a common enterprise and reasonably expects profits or returns derived

from the entrepreneurial or managerial efforts of others.

29.     Congress defined "security" broadly to embody a "flexible rather than a static

principle, one that is capable of adaptation to meet the countless and variable schemes devised by

those who seek the use of the money of others on the promise of profits."  *Id.* at 299.

## BACKGROUND ON CRYPTO ASSETS

30.     As used herein, the terms "crypto asset" or "token" generally refer to an asset

issued and/or transferred using blockchain or distributed ledger technology, including assets

referred to colloquially as a "digital asset," "cryptocurrency," "virtual currency," and digital

"coin."

31.     A blockchain or distributed ledger is a database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks."  The system relies on cryptographic techniques for secure recording of transactions.

32.     The Ethereum blockchain is an example of a blockchain.  Ether (or "ETH") is the Ethereum blockchain's native token.  (Some crypto assets may be "native tokens" to a particular blockchain—meaning that they are represented on their own blockchain, though other crypto assets may also be represented on that same blockchain, as is the case with the Ethereum blockchain.)

33.     ERC-20 is a standard protocol (or technical specification of the type of crypto token) currently used on the Ethereum blockchain to create and represent tokens on that blockchain.

34.     A crypto asset "wallet" is hardware or software that enables users to store private keys, which function like passwords that are used to access and transfer crypto assets.

35.     Crypto asset trading platforms allow their customers to purchase and sell crypto assets for fiat currency (legal tender issued by a country) or for other crypto assets, depending on the platform.  "Off-chain" transactions are tracked in the internal recordkeeping mechanisms of the platform but do not involve transferring crypto assets from one wallet to another, while "on-chain" transactions are those involving the transfer of a crypto asset from one blockchain address to another.

36.     On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:  The DAO*, advising "those who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to

ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto assets at issue in that report involved investment contracts and thus securities.

## **BACKGROUND ON MARKET MAKERS**

37.     "Market makers" are in the business of buying securities from those who wish to sell, and selling securities to those who wish to buy, and operate in many traditional securities markets.  Market makers "make markets" by continuously and publicly quoting both a price at which they are willing to buy a security (the "bid") and a higher price at which they are willing to sell the security (the "ask").  The difference between these prices is known as the "bid-ask spread," (or just "the spread") and is one of the ways market makers earn money through both buying and selling—i.e., "making a market" for—securities.

38.     Market makers can affect the liquidity, depth, and efficiency of markets by ensuring that there is always a counterparty willing to transact with buyers and sellers at publicly quoted prices.  This is especially the case for thinly traded securities, where there may be few "natural" (or "organic") buyers and sellers in the market.  A market maker can provide liquidity to a seller of a security when it is difficult to find a natural buyer, or to a buyer of a security when it is difficult to find a natural seller.

39.     In traditional securities markets, trading platforms such as national securities exchanges frequently offer incentives for market makers to provide real liquidity to traders on the platform, even for illiquid securities and during periods of market stress.

40.     In traditional securities markets, market makers and other market participants are regulated with a view toward promoting benefits to the overall market and deterring any conflicts of interest or unfair trading advantages.  Market makers are subject to requirements regarding registration, capital, trade reporting, and business conduct standards, among other things.  By

contrast, self-described market makers operating on unregistered crypto asset trading platforms do not adhere to these requirements.  In such an environment and in the absence of regulatory compliance and its concomitant oversight, market makers have ample opportunities to act on powerful incentives to manipulate a token's price and/or trading volume.

41.     For example, unlike in the traditional, regulatorily compliant markets, in the crypto asset markets it is often the token offeror who pays these market makers a monthly fee. These fees pay for services that may include artificially inflating trading volumes to create the false impression that there is a robust market for what is in reality a thinly traded crypto asset.  A market maker might accomplish this by using one or more accounts it directly or indirectly controls to trade against its own quotation.  Here, there is no change in beneficial ownership of the asset traded, but the trade creates the appearance of a market-driven transaction.  This phenomenon is known as "wash trading."

42.     Similarly, the token offeror might seek to have one or more market makers create artificial volume to meet minimum requirements for having their crypto asset made available on one or more crypto asset trading platforms.  This could give the crypto asset greater prominence and potentially attract more natural buyers and sellers.

43.     Manipulative trading can benefit both the offeror and the market maker at the expense of natural investors.  Each has incentives to generate public interest in the token so that they can liquidate their token supplies at higher prices—particularly if the crypto asset's offerors and their affiliates have retained large portions of the assets at inception (as is common in the crypto asset markets), which they cannot monetize absent demand from natural buyers.

## FACTS

I.    **ZM Quant Manipulated the Market for NexFundAI.**

A.    **NexFundAI Was Offered and Sold as a Security.**

44.    In 2024, the NexFundAI crypto asset, along with related promotional materials on a publicly available website, was created at the direction of the FBI.  NexFundAI is an ERC-20 standard token on the Ethereum blockchain.

45.    As described on its website, the NexFundAI token was a vehicle to invest in "early-stage AI projects, generating returns distributed back to . . . token holders."  More specifically, the website explained that an experienced development team would identify early-stage companies and crypto projects involving artificial intelligence and would invest proceeds from the sales of NexFundAI tokens in these projects.

46.    According to the NexFundAI website, investors in NexFundAI were supposedly entitled to a share of any profits generated by the investments in these projects, as well as a share of the fees generated from NexFundAI transactions, all in proportion to their NexFundAI holdings.

47.    Beginning in or about May 2024, NexFundAI was offered and sold to the public on a crypto asset trading platform.

48.    Moreover, NexFundAI was offered and sold as a security.

49.    *First*, NexFundAI purchasers, including those who bought it on crypto asset trading platforms, invested money—specifically U.S. dollars, Bitcoin, or ETH—when they purchased NexFundAI.

50.    *Second*, NexFundAI purchasers invested in a common enterprise.  Because the value of NexFundAI rose or fell together and equally for all holders, all NexFundAI holders

profited or suffered losses equally in amounts proportionate to their NexFundAI holdings.  As such, each NexFundAI investor's financial fortunes—including the realization of future profits— were inextricably tied together.

51.     Further, according to the NexFundAI website, 25 percent of the initial supply of NexFundAI was allocated to an "investment wallet," which would be used to fund investments with goal of generating profits for all NexFundAI investors.  Thereafter, for each NexFundAI on-chain transaction conducted on the blockchain, one percent of the value of the transaction was distributed to and pooled in the investment wallet, such that "[e]ach transaction grows the investment fund."  The proceeds pooled in the investment wallet would be used to fund the early-stage artificial intelligence companies and crypto projects.  And "80% of profits from [these] investment projects" would be "distributed to token holders."

52.     Moreover, as the marketing materials for NexFundAI publicly explained, for each NexFundAI on-chain transaction, one percent of the value of the transaction was redistributed to NexFundAI holders in proportion to their NexFundAI holdings, and another one percent of the value of the transaction was "burned" (or destroyed), decreasing the supply of NexFundAI.[1]

53.     *Third*, NexFundAI's promotional materials led NexFundAI investors to reasonably expect that they would profit from their NexFundAI investments, based on the entrepreneurial and managerial efforts of others, including the NexFundAI project team.

54.     The NexFundAI website invites "AI Startups / Projects" to "contact us directly and start a discussion on your project" and potential "funding."  As described on the website, the "projects / startups" the project team identified "will be integrating with" the NexFundAI token.

---

[1]  "Burning" crypto assets refers to sending those assets to an inaccessible wallet from which the tokens cannot be withdrawn, thereby removing them from circulation.

From the perspective of an investor, such integration, if it occurred, would increase the uses for—and, consequently, the number of transactions involving—NexFundAI. Increased transactions would, in turn, generate additional transaction fees that would be redistributed proportionally back to NexFundAI holders.

55.    The NexFundAI website expressly and repeatedly described NexFundAI as an "investment" with the potential for profit. By way of example, the website stated that NexFundAI was "an investment vehicle" that "generat[ed] returns distributed back to our token holders" and was intended to "provid[e] . . . financial returns." Moreover, the website explained that NexFundAI also served as a source of passive income for its holders by virtue of transaction fees that generated redistributions to holders and decreased NexFundAI's available supply.

**B.    ZM Quant Agreed to Artificially Inflate NexFundAI's Trading Volume.**

56.    After NexFundAI and its promotional materials were developed, individuals posing as NexFundAI's promoters (the "NexFundAI team") approached Lau about the possibility of hiring ZM Quant to manipulate the market for NexFundAI. Over a series of discussions with the NexFundAI project team that are summarized below, ZM Quant agreed to manipulate the trading volume of NexFundAI in exchange for a fee. At all relevant times, one or more members of the NexFundAI team was located in the District of Massachusetts.

57.    In or around January 2024, the NexFundAI team began to engage with Ou and Lau about hiring ZM Quant to provide "volume support" for NexFundAI. In the course of these discussions, Ou provided a service agreement indicating that, for fees of varying amounts, ZM Quant could provide: (i) "[v]olume support, create volume in accordance with your case"; (ii)

"basic orderbook filling"; (iii) a "[t]rading bot for candle chart and volume" to "[d]emonstrate good and continuous candle chart"; and (iv) a "[t]rading bot for price matching."[2]

58.     At Lau's request, the NexFundAI team provided a video preview of the NexFundAI website.

59.     On or around March 7, 2024, the NexFundAI team held an initial videoconference with Lau to discuss potentially retaining ZM Quant as NexFundAI's "market maker."

60.     During this meeting, the NexFundAI team made their purpose plain, telling Lau that the project team wanted to hire a "market maker" to trade NexFundAI for the purpose of creating the "appearance of volume and interest" in the token, and that the "idea behind the project" was to enable members of the NexFundAI team to "pull our profits" (i.e. profit from the sale of the NexFundAI crypto asset to investors).

61.     Lau suggested that ZM Quant's efforts to create artificial trading volume would complement a project team's efforts to organically build a "user community" through "marketing" that would "let people know about the token . . . and let them believe that this token have [sic] . . . potential opportunities" to increase by "10 times or 100 times."  Lau further stated that, for the project team, this interest could create additional opportunities to "pump the price" and "cash out" (i.e., sell the project team's holdings for a profit).

62.     During the same call, another purported member of the NexFundAI team stated that NexFundAI needed "volume" and "all the sexy stuff that comes with it."  As previously

_____

[2]  A "candle" is a graphic snapshot of whether the market price of a security moved positively or negatively and to what degree.  The "candlestick" measures the opening and closing prices during a given timeframe, and the "wick" measures the highest and lowest prices.  A "green candle" shows that a security's market price has increased during the relevant period, whereas a "red candle" shows that a security's market price has decreased during the relevant period.

described, Lau confirmed that ZM Quant could "create trading volumes" and "pump the price
. . . to make the chart [showing the token's price and trading volume] look beautiful, look like
it's rising."  Lau explained that ZM Quant uses what he quantified as 1,000 – 2,000 wallets to
conduct multiple transactions and thus create high trading volumes.  Lau further stated that when
the token "hit [sic] top gainer on the Uniswap, the users will come to trade.  They will see the
potential opportunities and they will . . . chase the price."

63.     During another virtual meeting on March 18, 2024, which included both Lau and
Ou, Lau told the NexFundAI team about a prior instance in which ZM Quant helped another
crypto asset project team "cash out at the peak" (meaning, sell their tokens at a high price).  Lau
showed the NexFundAI team the trading chart of the other token and explained:  "We cash out at
peak.  We helped them to cash out the tokens for each peak and get the profits."  Ou added that
for some projects, even when peaks were created, there were no other investors that purchased
the token, explaining that "organic volumes" were needed to allow a project team to successfully
profit from selling their own tokens.

64.     ZM Quant emphasized the importance of a marketing campaign coordinated with
the manipulative trading activity.  Lau explained that when the token price increases and organic
traders are active, it provides the project team with a good opportunity to cash out, and that the
project team could then let ZM Quant know they wanted to start the "cash out process."  ZM
Quant explained that it would then distribute tokens into multiple wallets and sell in small
amounts to collect profits that it would later pool for the project team, in order to capture profits
without significantly impacting the price of the crypto asset.

65.     When one member of the NexFundAI team asked how ZM Quant avoids the risk
of exposure, Ou explained that one aspect of its strategy involves "changing the wallets" used for

trading because it "would look so fake" if the same addresses continued to trade over time.  Ou

clarified that the need to change wallets exists only for trading activity on purportedly

decentralized platforms, where the wallet addresses conducting the transactions are visible to the

public.

66.     Lau and Ou repeatedly expressly acknowledged the purpose for which ZM Quant

had been hired by the NexFundAI team.  For example, when a member of the NexFundAI team

asked during the March 18 virtual meeting if ZM Quant's "market making" involves

"manipulating [wallets] to the point where the price of the token will either rise or fall," Lau

responded:  "Correct."  Similarly, when a member of the NexFundAI team told Ou during an

April 23, 2024 virtual meeting that he was arranging to get funding to ZM Quant to "start . . .

pumping this thing up the way we want," Ou responded:  "Yep."

67.     Ultimately, the discussions with Ou and Lau led to the drafting of a service

agreement whereby the NexFundAI team would pay ZM Quant a monthly fee of $2,500 in

another crypto asset, USDT (or "Tether") for what the agreement describes as "trading

consultation or suggestions, trading and capital risk alerts and warnings . . . to maintain the

stability of the [NexFundAI token] project by market making intelligent bots."

68.     On May 8, 2024, a member of the NexFundAI team executed the service

agreement.  The next day, Ou sent back the countersigned agreement, and the fee was transferred

to a crypto asset wallet address identified in the agreement as belonging to ZM Quant.

69.     On May 20, 2024, a member of the NexFundAI team transferred ETH and

NexFundAI tokens to ZM Quant's "test wallet" so that ZM Quant could conduct simulation

trades in a testing environment.

70.     On May 28, 2024, Lau stated that ZM Quant was "good to go with the launch."

C.      **ZM Quant Artificially Inflated NexFundAI's Trading Volume.**

71.     On May 29, 2024, the NexFundAI team made the NexFundAI token available for trading on Uniswap.[3]  The same day, ZM Quant was provided with approximately $5,000 each in NexFundAI tokens and wETH to facilitate trading at the direction of the FBI.

72.     Lau provided the NexFundAI project team a list of wallet addresses—200 in all—that ZM Quant intended to use to trade NexFundAI tokens and wETH in a Uniswap liquidity pool.

73.     On May 31, 2024, ZM Quant began trading NexFundAI on Uniswap, creating artificial trading volume for the purpose of inducing investors to purchase NexFundAI.  ZM Quant's manipulative trading lasted for approximately 9 hours, until the FBI caused trading of the token to be halted.

74.     During that period, eight of the wallet addresses that ZM Quant identified as those it intended to use for its manipulative trades executed 40 transactions using the NexFundAI token.  Each transaction was subject to a "gas" fee.  Based on the daily closing price of ETH, ZM Quant's trades generated an aggregate trading volume of approximately $4,600 during the nine-hour period.

75.     ZM Quant's trading volume was roughly split between transactions in which it sold NexFundAI tokens ($2,320) and transactions in which it bought NexFundAI tokens ($2,279).

---

[3]  Uniswap allows users interacting with "liquidity pools," which contain a specific pair of crypto assets, to "swap" (i.e. trade) one crypto asset in the pool for another.  The NexFundAI token was paired with "wrapped ether" (wETH), and to engage in trades, ZM Quant needed a quantity of NexFundAI tokens (to trade for wETH) and a quantity of wETH (to trade for NexFundAI).  Wrapped ether is an ERC-20 token that represents ether.  Any user can make any new pair of crypto assets available for trading on Uniswap by calling the Uniswap liquidity pool contract.

76.     During the time in which ZM Quant was actively trading NexFundAI, its trades accounted for 77.5% of NexFundAI transactions (31 of the 40 transactions) and 83.6% of the trading volume (approximately $4,600 of the approximately $5,500 total volume).

77.     The purpose of ZM Quant's trading activity was to generate artificial trading volume, falsely suggesting to anyone that viewed the trading that there were multiple parties interested in and actively trading NexFundAI.  By creating artificial trading volume, ZM Quant intended ultimately to induce others to buy NexFundAI, and individuals or entities other than ZM Quant appear to have purchased NexFundAI during the relevant period.

## II.     Defendants Manipulated the Market for the Saitama Crypto Assets.

### A.     The Saitama Crypto Assets Were Offered and Sold as Securities.

78.     Saitama is an ERC-20 standard token on the Ethereum blockchain.

79.     No later than June 2021, four individuals—Russell Armand, Maxwell Hernandez, Manpreet Singh Kohli, and Nam Tran—published a website and a whitepaper in which they described Saitama as a "platform that promotes global financial wellbeing by empowering the youth to be in control of their money and create their own wealth opportunities."[4]

80.     According to the whitepaper, the Saitama project leaders (which included Armand, Hernandez, Kohli, and Tran) would build an "ecosystem" of products and services specifically built for Saitama.  Armand, Kohli, and Tran were also leaders of a project to develop and promote SaitaRealty, a separate but related ERC-20 standard token that was offered and sold as a security.

81.     The Saitama project leaders promoted Saitama, SaitaRealty, and the Saitama

---

[4] According to the Saitama whitepaper, the Saitama "brand and token name took inspiration from the legend of a mysterious 'ghost dog' that is said to be roaming the mountains in the region of Saitama in Japan" and is revered as "a guardian against misfortune."

ecosystem through several social media and communications platforms, including X (formerly Twitter), Instagram, YouTube, Vimeo, Facebook, Discord, and the encrypted messaging platform Telegram, in addition to the Saitama website, which they periodically updated and on which they published a series of iterative whitepapers that described the Saitama project and their collective efforts to generate value for Saitama investors.

82.　All of these communications were aimed at the investing public, including investors in the United States.

83.　The Saitama project leaders offered and sold Saitama as a security, specifically as an investment contract, including on numerous crypto-asset trading platforms.

84.　*First*, Saitama purchasers, including those who bought it on crypto asset investment platforms, invested money—specifically U.S. dollars, Bitcoin, or ETH—when they purchased Saitama.

85.　*Second*, all Saitama purchasers invested in a common enterprise with each other and with the Saitama project leaders, who at all relevant times retained significant Saitama holdings.  Because the value of Saitama rose or fell together for all holders, all Saitama holders profited or suffered losses equally in amounts proportionate to their Saitama holdings.  As such, their financial fortunes—including the realization of future profits—were inextricably tied to the financial fortunes of each other as well as those of the Saitama project leaders.

86.　The Saitama project leaders each offered and sold Saitama to the investing public both to enrich themselves personally, and to collectively fund their efforts to develop the "Saitama ecosystem."

87.　In addition, Saitama investors' financial fortunes depended on the Saitama project leaders' efforts to grow the Saitama ecosystem, including by creating new uses for Saitama such

that its utility would increase, thereby increasing the demand for and correspondingly the price of Saitama.

88.    Moreover, for each on-chain Saitama transaction, two percent of the value of the transaction was redistributed to Saitama holders in proportion to their Saitama holdings, and another two percent of the value of the transaction was "burned" or destroyed, decreasing the supply of Saitama.  These automatic redistributions of Saitama further ensured that the financial fortunes of the Saitama project leaders (who held large positions in Saitama and were developing uses for the token, including with the proceeds of Saitama sales) and the financial fortunes of other investors were intertwined.

89.    *Third*, the Saitama project leaders led Saitama investors to reasonably expect that they would profit from their Saitama investments, based on the project leaders' entrepreneurial and managerial efforts.

90.    Through the Saitama website, whitepaper, social media, and other public outlets, the Saitama project leaders held themselves out as the driving force behind the creation and future development, maintenance, and growth of the Saitama ecosystem from which Saitama derived its value.

91.    Moreover, beginning as early as July 2021, some of the Saitama project leaders identified themselves on the Saitama website and highlighted their backgrounds; their purported experience in traditional finance and crypto-related projects; and their entrepreneurial and managerial efforts to increase the value of Saitama.

92.    In August 2021, the Saitama project leaders further formalized the management of the Saitama project by establishing Saitama LLC in Massachusetts, with some of the Saitama project leaders serving as managers of the corporate entity.  At various times, certain Saitama

project leaders publicly identified themselves as corporate officers of the Saitama enterprise: Armand identified himself as Saitama's Chief Executive Officer and Chief Operations Officer; Hernandez as its Chief Technology Officer; Kohli as its Chief Financial Officer; and Tran as its Chief Business Officer.

93.     The Saitama project leaders published the first Saitama whitepaper in June 2021. In that whitepaper, they expressly and repeatedly described Saitama as an investment with the potential for substantial profit, while describing themselves as the individuals who would undertake the efforts needed to achieve those profits—specifically, as "a group of committed individuals" that "took over [the Saitama] project and continued developing it." That development took the form of creating various applications, including those previously described, in which investors could supposedly use and trade Saitama tokens.

94.     Investors were led to reasonably expect not only that the Saitama project leaders' development of these applications would increase demand for Saitama and therefore its price, but also that such uses would lead to additional Saitama transactions. As described above, each on-chain transaction resulted in a two-percent redistribution to existing Saitama holders and an additional two-percent burn. From the earliest iterations of their Saitama website and whitepaper, the Saitama project leaders touted these aspects of Saitama as a way for investors to earn passive income on their Saitama holdings.

95.     The Saitama project leaders also led investors to reasonably expect to profit from their Saitama investments by publicly touting the results of the Saitama project leaders' efforts to have Saitama listed on numerous trading platforms, where investors would be able to sell their Saitama holdings for a profit. Saitama initially traded on Uniswap, and later on numerous other platforms, including at various times Bybit, OKX, Gate, LBank, Bitmart, MEXC, and XT.

96.     At all relevant times, the Saitama project leaders encouraged investors to purchase Saitama, and provided specific instructions on how to do so on the Saitama website.

97.     As a result of the above representations and the economic reality of what the Saitama project leaders were offering and selling, Saitama investors had a reasonable expectation of profiting from the Saitama project leaders' efforts to develop the Saitama ecosystem and list Saitama on trading platforms.

98.     In March 2022, Armand, Tran, and Kohli began offering and promoting SaitaRealty.  SaitaRealty, another ERC-20 standard token, purported to relate to "a real estate ecosystem" that, according to an initial whitepaper published in March 2022, "will provide a range of opportunities in many different forms like Zero-Emission Homes, multi family dwelling units/condominiums, affordable housingz [sic], business complexes, and commercial land development."  Armand, Tran, and Kohli were among the leaders of the project to develop this ecosystem.

99.     The whitepaper stated that SaitaRealty "is a sister token of Saitama LLC and is led by the same trusted team," which included Armand (Chief Operations Officer), Tran (Chief Business Officer), and Kohli (Chief Financial Officer), among others.[5]

100.     The SaitaRealty project leaders offered and sold SaitaRealty as a security, specifically an investment contract, including on several crypto asset trading platforms.

101.     *First*, SaitaRealty purchasers, including those who bought it on crypto asset investment platforms, invested money—specifically U.S. dollars, Bitcoin, or ETH—when they

---

[5]  Hernandez was also initially identified as a leader of the SaitaRealty project and its Chief Technology Officer.  On or about April 20, 2022, Hernandez told Armand via WhatsApp that he was planning to resign to avoid being associated with Saitama "when the sec shows up."  On May 18, 2022, Hernandez announced on X his resignation from the Saitama project.

purchased SaitaRealty.

102.    *Second*, all SaitaRealty purchasers invested in a common enterprise with the SaitaRealty project leaders, who retained significant SaitaRealty holdings.  Moreover, because the value of SaitaRealty rose or fell together for all holders, all SaitaRealty holders profited or suffered losses in amounts proportional to their SaitaRealty holdings.  As such, their fortunes— including the realization of future profits—were inextricably tied to the SaitaRealty project leaders' fortunes and each others'.

103.    The SaitaRealty project leaders collectively funded the SaitaRealty enterprise and its operations through (1) increasing the value of SaitaRealty, a large portion of which they held in reserve, and (2) collecting a portion of a "token tax" on every on-chain SaitaRealty transaction.

104.    The whitepaper published by the SaitaRealty project leaders further explained the economics of the SaitaRealty enterprise.  According to the whitepaper, each on-chain SaitaRealty transaction incurred a 9 percent "token tax."  Of the 9 percent "token tax," 5 percent was used to provide capital for Armand, Tran, Kohli, and other project leaders to invest in physical real estate.  The remaining 4 percent was allocated as follows:  1 percent was burned, decreasing the overall token supply; 1 percent was redistributed to existing SaitaRealty holders; and 2 percent was retained for use by the SaitaRealty project leaders for marketing development.

105.    As was the case with Saitama, SaitaRealty's automatic redistribution and destruction of tokens further ensured that the financial fortunes of the SaitaRealty project leaders (who held large positions in SaitaRealty and were developing uses for the token) and those of investors were intertwined.

106.    *Third*, the SaitaRealty project leaders led Saitama investors to reasonably expect

that they would profit from their SaitaRealty investments, based on the SaitaRealty project leaders' managerial efforts.

107.    As noted, the SaitaRealty project leaders held themselves out as the managers of SaitaRealty, responsible for the development of the SaitaRealty ecosystem and for the investment of capital raised through SaitaRealty sales.

108.    The SaitaRealty project leaders explained on the SaitaRealty website how the capital raised from investors' SaitaRealty purchases would be invested and how returns on those investments would be distributed to SaitaRealty holders.

109.    Specifically, they stated that: "Capital comes from a token tax per each transaction . . . .  The funds will then be used to purchase real property for development.  Once the real property generates revenue, the distribution is as follows:  50% Franchising and Expansion[;] 25% Profit Redistribution for Staked Coin Holders[;] 25% Outreach Initiative for Homeless Veterans and for Affordable Housing."

110.    In October 2023, the SaitaRealty project leaders announced, via the official SaitaRealty account on X, that they had acquired their first piece of physical real estate (a townhouse in Dubai), and promised "a future filled with many more such properties" that would "creat[e] the best portfolio possible for investors, and of course sharing profits on sells."

111.    In the fall of 2022, Armand, Tran, and Kohli announced on the SaitaRealty website that investors stood to profit not only from purchases of physical real estate, but from purchases of digital real estate located in the "metaverse":  "We designed a plan that allows investors to help develop a realty ecosystem via strategic tokenomics that will collect the capital necessary to fund these new infrastructures while returning profit to the investors."  The SaitaRealty project leaders launched a new application called SaitaCity, a "real estate market

simulator" where players could build and trade property in the metaverse to earn profit, badges, and voting power, in what Armand, Tran, and Kohli claimed was a decentralized autonomous organization.

112.    A version of the SaitaRealty whitepaper dated October 5, 2022, stated that SaitaRealty would offer a "Value Proposition" for metaverse "real estate investors" by combining SaitaRealty's purported consumptive use as a currency with a built-in tax system to fund purchases of metaverse real estate.  The whitepaper also stated that both SaitaRealty and Saitama tokens would be used by the developers in SaitaCity for purposes of "supply burn" and "funding."

113.    The SaitaRealty project leaders also led investors to reasonably expect to profit from their SaitaRealty investments by publicly touting the results of their efforts to have SaitaRealty listed on numerous trading platforms, where investors would be able to sell their SaitaRealty tokens.

114.    For example, on March 25, 2022, the SaitaRealty project leaders used the official SaitaRealty account on X to inform the public that SaitaRealty had launched and was available to trade on SaitaMask, the smart wallet application that the project leaders created.  On April 26, 2022, the SaitaRealty project leaders posted to X that SaitaRealty would be "listed" (or made available for purchase) on LBank as of April 28, 2022.  Later, Armand, Tran, and Kohli informed investors that SaitaRealty was listed on two other exchanges, MEXC and XT.

115.    Leading up to SaitaRealty's launch and continuing thereafter, Armand, Tran, and Kohli regularly promoted the investment on various social media platforms.

116.    At all relevant times, the SaitaRealty project leaders encouraged investors to purchase SaitaRealty, and provided specific instructions on how to do so on the SaitaRealty

website.

117.     As a result of the above representations and the economic reality of what the SaitaRealty project leaders were offering and selling, SaitaRealty investors had a reasonable expectation of profiting from the project leaders' efforts to develop the SaitaRealty ecosystem, to invest in physical and digital real estate, and to list SaitaRealty on trading platforms.

**B.     ZM Quant Was Hired to Artificially Inflate the Saitama Crypto Assets' Trading Volume.**

118.     In or around September 2021, as the Saitama project leaders prepared to launch the Saitama token on additional crypto asset trading platforms, they began discussing with Ou the possibility of hiring ZM Quant to serve as the token's "market maker."

119.     During these introductory discussions, ZM Quant provided the Saitama project leaders with a slide deck to pitch its services, touting ZM Quant's ability to "attract market participants" by providing "increased volume" and "perfect candles."  ZM Quant also sent the Saitama project leaders a two-page document listing five different levels of service offerings, with the cost ranging from $1,500 to $10,000 monthly to be paid in Tether.  The most basic offering, for $1,500 in Tether per month, was entitled "Trading bot for candle chart and volume" and promised, among other things, to "[d]emonstrate [a] good and continuous candle chart" and to "create volume in accordance with your case."

120.     The Saitama project leaders understood the reference to "perfect candles" and "continuous candles" to mean that ZM Quant would engage in manipulative trading to artificially "create volume" with the intent of generating trading charts that suggest steady growth of—and organic investor interest in—a particular crypto asset.

121.     The Saitama project leaders ultimately engaged ZM Quant to provide these services for the Saitama Crypto Assets at the service level priced at $1,500 in Tether.

**C.** **Defendants Engaged in Manipulative Trading of the Saitama Crypto Assets.**

122.    From 2021 through 2023, the Saitama project leaders paid ZM Quant at least $27,000 for the express purpose of creating artificial trading volume for the Saitama Crypto Assets on various crypto asset trading platforms.

123.    To achieve these ends, the Saitama project leaders regularly provided ZM Quant with Saitama Crypto Assets for trading on various crypto asset trading platforms.  In addition, the Saitama project leaders notified their points-of-contact at these trading platforms that ZM Quant was providing market making services for the Saitama Crypto Assets and requested that the trading platforms "whitelist" ZM Quant's trading accounts so that its frequent trades would be exempt from the transaction fees that trading platforms normally impose on non-whitelisted accounts.

124.    For example, in or around January 16, 2023, Tran and Kohli requested a call with Ou to "set up funds and API for mm [market making]."  Approximately 20 minutes after requesting the call, Tran confirmed to ZM Quant that he had deposited "2k each pair" for "Saitama(v2)"—the second version of the Saitama token[6]—on the "XT" trading platform.  Approximately two hours later, Ou confirmed that he would start market making "asap."

125.    Approximately 12 hours thereafter, Tran asked Ou to "also put XT live."  A ZM Quant associate with a Telegram handle "Ariza | ZMQuant" responded to ask Tran to "deposit tokens on xt MM [market making] account."  Less than a minute later, Tran indicated that "Tokens are on the way . . . .  Will be quick."

---

[6]  In or around mid-2022, the Saitama project leaders released a new version of the Saitama smart contract (i.e. "v2").  The total supply of Saitama was reduced, with existing investors receiving new Saitama tokens in proportion to their existing holdings.  The token "tax" was altered, but the structure and incentives remained similar.

126.    Trade data from the XT trading platform reflects that during the 24-hour period following the call and subsequent Telegram chat described above, transaction volume increased significantly from fewer than 16 million trades and less than $20 in trading volume to more than 132 billion trades and $250,000 in trading volume.

127.    Trading volumes for Saitama on the XT platform increased substantially from there and stayed above the pre-manipulation levels for months thereafter.  Figure 1 summarizes data extracted from the XT trading platform that illustrates this spike in trading volume.

| Date | Transaction Quantity | Transaction Volume |
|---|---|---|
| 2023-01-10 | 5,497,618 | $ 4.84 |
| 2023-01-11 | 5,989,277 | $ 5.27 |
| 2023-01-12 | 4,487,968,259 | $ 4,334.02 |
| 2023-01-13 | 20,275,208 | $ 23.61 |
| 2023-01-14 | 85,886,097,807 | $ 163,834.70 |
| 2023-01-15 | 10,646,516 | $ 12.54 |
| 2023-01-16 | 15,391,498 | $ 19.56 |
| 2023-01-17 | 132,832,039,198 | $ 258,477.30 |
| 2023-01-18 | 2,339,892,144,504 | $ 5,871,951.70 |
| 2023-01-19 | 1,323,892,786,509 | $ 3,514,804.79 |
| 2023-01-20 | 14,710,179,632,379 | $ 82,530,094.79 |
| 2023-01-21 | 1,382,117,888,352 | $ 10,545,965.50 |
| 2023-01-22 | 1,016,754,798,975 | $ 6,684,639.71 |
| 2023-01-23 | 2,362,039,171,313 | $ 16,956,533.90 |

*Figure 1:  Transaction quantity and volume for Saitama, January 2023*

128.    The following day, after Saitama trading volumes had increased on XT as a result of ZM Quant's wash trading, Tran sent ZM Quant the information that it would need to trade the SaitaRealty token on the Bitmart trading platform, and requested that ZM Quant "please get that going also."  Less than 24 hours later, Tran followed up to request that ZM Quant start trading "asap," and a ZM Quant associate with the Telegram handle "Marco | ZMQuant" indicated that he had started the trading bot for the SaitaRealty token on Bitmart.  Approximately 45 minutes after that, however, Marco reported a high trade fee, which, as depicted in the communication

below, led him to report that he was going to "pause the self trade for now," meaning that he

would stop trading back and forth between accounts controlled by ZM Quant—i.e., wash trading.



*Figure 2:  Telegram communication between Tran of the SaitaRealty project*
*and "Marco" of ZM Quant regarding market manipulation on Bitmart*

129.    At other times, ZM Quant generated artificial trading volume for the Saitama

Crypto Assets on the XT platform for the express purpose of meeting XT's minimum volume

requirements and to avoid having the Saitama Crypto Assets removed from the platform.  For

example, on or around May 26, 2023, a representative from the XT trading platform warned the

SaitaRealty project leaders in a private Telegram chat that the SaitaRealty token was at risk of

being "delist[ed]" if its trading metrics did not improve, as shown below:



*Figure 3:  Telegram communicaton from XT trading platform to SaitaRealty project leaders regarding platform requirements*

130.    In response, Tran, one of the SaitaRealty project leaders, immediately replied to

the group, directing the communication to Ou's username (i.e., "tagging" him in the group

communication):  "We will increase volume within a day."  Tran then asked for XT to

"whitelist" an account for "market making" to avoid the platform's trading fees:



*Figure 4:  Telegram communicaton from Tran to ZM Quant and XT trading platform*

131.    Once XT approved the whitelist request and ZM Quant was cleared to restart trading, trading volume for the SaitaRealty token increased immediately.  Specifically, trading volume increased from de minimis levels in the several days prior to the May 26, 2023 Telegram chats with XT to quadrillions of individual trades and billions of dollars in daily volume the day after the Telegram chat.  Figure 5 below summarizes the data from the XT platform that illustrates the foregoing, reflecting a more than 412,000,000,000 percent increase in transaction quantity volume from the last day there was trading, four days earlier.

| Date | Transaction Quantity | Transaction Volum |
|---|---|---|
| 2023-05-11 | 25 | $ 0.00 |
| 2023-05-12 | 1,008,016 | $ 0.20 |
| 2023-05-13 | 3,246,150,625 | $ 165.67 |
| 2023-05-14 | 1,002,001 | $ 0.03 |
| 2023-05-15 | 97,594,641 | $ 18.84 |
| 2023-05-16 | 1 | $ 0.00 |
| 2023-05-17 | 804,609 | $ 0.03 |
| 2023-05-19 | 9 | $ 0.00 |
| 2023-05-23 | 28,217,344 | $ 1.02 |
| 2023-05-27 | 116,306,053,937,387,000 | $ 5,410,119,906.21 |
| 2023-05-28 | 331,922,343,174,080,000 | $ 14,353,345,447.17 |
| 2023-05-29 | 303,448,214,804,873,000 | $ 11,988,999,558.89 |
| 2023-05-30 | 327,175,768,971,768,000 | $ 12,028,905,405.89 |
| 2023-05-31 | 342,102,350,531,006,000 | $ 11,554,209,294.91 |
| 2023-06-01 | 319,432,108,341,295,000 | $ 11,988,908,970.88 |
| 2023-06-02 | 310,056,580,774,290,000 | $ 12,804,600,197.92 |
| 2023-06-03 | 314,976,358,389,182,000 | $ 13,012,798,303.20 |
| 2023-06-04 | 324,242,836,501,716,000 | $ 13,398,912,268.08 |
| 2023-06-05 | 321,579,146,844,501,000 | $ 13,787,716,052.18 |
| 2023-06-06 | 304,533,887,413,584,000 | $ 13,496,043,922.30 |

*Figure 5:  Trading quantity and volume for SaitaRealty in May-June 2023*

132.     Trading volume for the SaitaRealty token did not drop below eight figures for

months thereafter.

133.     ZM Quant's involvement in trading the Saitama Crypto Assets continued through

at least September 2023.

## FIRST CLAIM FOR RELIEF
## <u>FRAUD IN THE OFFER OR SALE OF SECURITIES</u>
### (Violations of Sections 17(a)(1) and (3) of the Securities Act)

134.     The Commission re-alleges and incorporates by reference the allegations

contained in paragraphs 1 through 133.

135.     At all relevant times, NexFundAI, Saitama, and SaitaRealty were offered and sold

as securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

136.     By reason of the conduct described above, Defendants, in connection with the

offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently (i) employed devices, schemes, or artifices to defraud and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

137.    By reason of the conduct described above, Defendants violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §§ 77q(a)(1) and (3)] and will continue to violate those sections unless enjoined.

### SECOND CLAIM FOR RELIEF
### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
#### (Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c))

138.    The Commission re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 133.

139.    At all relevant times, NexFundAI, Saitama, and SaitaRealty were offered and sold as securities under Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

140.    By reason of the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, or recklessly, (i) employed devices, schemes, or artifices to defraud and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

141.    By reason of the conduct described above, Defendants violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a) and (c)] thereunder and will continue to violate those provisions unless enjoined.

### THIRD CLAIM FOR RELIEF
### MARKET MANIPULATION
### (Violations of Section 9(a)(2) of the Exchange Act)

142.    The Commission re-alleges and incorporates by reference the allegations

contained in paragraphs 1 through 133.

143.    At all relevant times, NexFundAI, Saitama, and SaitaRealty were offered and sold

as securities under Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

144.    By reason of the conduct described above, Defendants, directly or indirectly,

effected a series of transactions in a security not registered on a national securities exchange,

creating actual or apparent active trading in such security, or raising or depressing the price of

such security, for the purpose of inducing the purchase or sale of such security by others.

145.    By reason of the conduct described above, Defendants violated Exchange Act

Section 9(a)(2) [15 U.S.C. § 78i(a)(2)] and will continue to violate that section unless enjoined.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.    Enter a permanent injunction restraining Defendants, their agents, servants,

employees and attorneys, and those persons in active concert or participation with them who

receive actual notice of the injunction by personal service or otherwise, from violating Sections

17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)], and Sections 9(a)(2) and

10(b) of the Exchange Act [15 U.S.C. §§ 78i(a)(2) and 78j(b)] and Rules 10b-5(a) and (c)

thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

B.    Order Defendants to disgorge, with prejudgment interest, all ill-gotten gains

obtained by reason of the unlawful conduct alleged in this Complaint pursuant to Sections

21(d)(5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and (7)];

C.     Order Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

D.     Enter an order prohibiting Defendants from participating, directly or indirectly, in any issuance, purchase, offer, or sale of any securities, provided, however, that such injunction shall not prevent Defendants Ou and Lau from purchasing or selling securities for their personal accounts;

E.     Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.     Grant such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

The Commission demands a jury in this matter for all claims so triable.


DATED:  October 9, 2024.


                                   Respectfully submitted,


                                   */s/  Amy Harman Burkart*
                                   Amy Harman Burkart (Mass. Bar No. 651828)
                                   David J. D'Addio (Mass. Bar No. 665790)
                                   Colin Missett (Mass. Bar No. 706248)
                                   Ivan Panchenko (Mass. Bar No. 693552)

                                   SECURITIES AND EXCHANGE COMMISSION
                                   Boston Regional Office
                                   33 Arch St., 24th Floor
                                   Boston, MA 02110
                                   Phone:  (617) 573-5905 (Burkart direct)
                                   Fax:  (617) 573-4590 (fax)
                                   Burkarta@sec.gov
                                   Daddiod@sec.gov